IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 77914-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| EDWARD AMES YECK, | UNPUBLISHED OPINION |
| Appellant. | FILED: October 7, 2019 |

LEACH, J. — A jury convicted Edward Yeck of three counts of domestic violence felony violation of a court order. On appeal, Yeck challenges the trial court's evidentiary rulings, denial of his motion for a mistrial, and imposition of a mandatory DNA[1] collection fee. We remand to strike the DNA collection fee but otherwise affirm Yeck's convictions.

## FACTS

Edward Yeck and Terry Remsberg met in December 2015 and began an "up and down" intimate relationship. Their relationship ended in February 2017. In March 2017, the King County Superior Court entered an agreed order protecting Remsberg from Yeck for three years.[2] The order prohibited Yeck from

---

[1] Deoxyribonucleic acid.
[2] Yeck was present in court and signed the order for protection.

having any contact with Remsberg, whether "in person or through others, by phone, mail, or any means, directly or indirectly."

On July 23, 2017, Remsberg received a Facebook message from Yeck's Facebook account. The message told Remsberg that Yeck sent her some paperwork about "life insurance policies" and asked her, "[D]on't you think you have ignored me long enough? . . . can't you find it in your Christian heart to forgive me??!"

On July 29, 2017, Remsberg received an envelope postmarked July 27 with Yeck's apartment listed as the return address. The envelope contained an unsigned three-page handwritten letter. Remsberg immediately recognized Yeck's handwriting. In the letter, Yeck talks about acquiring a $500,000 life insurance policy and wanting Remsberg to be the beneficiary "for just being you and being my woman for 14 of the best months in my life." The envelope also contained a life insurance advertisement for Yeck and a page describing Yeck as the owner of a $10,000 life insurance policy and Remsberg as the primary beneficiary.[3]

Also on July 29, Remsberg received another message from Yeck's Facebook account. This message demeaned Remsberg's intelligence and

---

[3] The policy declaration page also included Yeck's address, date of birth, and gender.

chided, "[Y]ou had a chance to recieve half a million dollars and chose to do things your way and not take the guift."[4]

Remsberg reported Yeck's contacts to the Seattle Police Department.[5] The police arrested Yeck on August 23, 2017. During a call from jail, Yeck told his friend "Linda" that "Terry said I texted her or something" so the police "picked me up on a no-contact order." Later in the call, Yeck continued, "I sent her that mail for the life insurance policy thing. I sent her—I was going to send her that in the mail," and that if she "turned me in for sending her that in the mail and breaking the contact order, that's pretty chippy shit."

The State charged Yeck with three counts of domestic violence felony violation of a court order.[6] Yeck pleaded not guilty. At trial, the State questioned Remsberg about how she learned of the Facebook messages Yeck sent her. Remsberg testified that a notification "dings up on my phone" and she opened "[s]ome of them." Defense counsel objected and moved to strike this testimony. The trial court sustained the objection and instructed the jury to disregard the State's last question and Remsberg's answer. The trial court denied defense counsel's request for a mistrial.

---

[4] Misspellings in original.

[5] Remsberg did not open the two Facebook messages she received from Yeck's account prior to giving them to the police.

[6] The trial lasted for six days, November 30, 2017, through December 12, 2017.

During cross-examination, defense counsel asked Remsberg if Yeck ever visited a recreational vehicle (RV) in which she previously lived. Remsberg gave the following nonresponsive answer: "He came to the RV and pounded on the door and shook the RV and—." The State objected to this testimony. The trial court sustained the objection and instructed the jury to disregard the question and answer. The trial court again denied defense counsel's request for a mistrial.

The trial court admitted evidence of three of Yeck's prior convictions for violating an order into evidence.[7] The court instructed the jury it could consider Yeck's prior convictions for the purpose of determining whether he "had twice been previously convicted for violating the provisions of a court order."[8] Over Yeck's ER 404(b) objection, the court also allowed the jury to consider the prior convictions "for the purpose of determining whether the actions charged in counts I, II and III constituted a 'mistake' or 'accident.'"

Yeck did not testify but defended on the theory that the State failed to prove he was the person who contacted Remsberg in July 2017.

The jury found Yeck guilty as charged on all counts. The trial court imposed a standard range concurrent sentences and ordered that Yeck serve a

---

[7] The court also admitted a copy of the March 2017 no-contact order.

[8] As part of its burden to prove a felony violation of a court order charge, the State must prove that the defendant has two prior convictions for violating an order. See RCW 26.50.110(5).

total of 60 months' confinement. It waived all nonmandatory legal financial obligations and imposed a $100 DNA collection fee.

Yeck appeals.

## STANDARD OF REVIEW

We review a trial court's decision to admit or exclude evidence for an abuse of discretion.[9] We also review a trial court's denial of a motion for a mistrial for an abuse of discretion.[10] A trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons.[11]

## ANALYSIS

### I. Evidence of Prior Convictions

Yeck first contends the trial court erred by admitting his three prior convictions to show absence of mistake or accident. He acknowledges that the State properly offered evidence of two convictions to prove an element of the charged crimes. He argues the court's admission of evidence of a third conviction and allowing the jury to consider the other two on the issue of mistake or accident violated ER 404(b) because he did not claim mistake or accident as a defense. We agree.[12]

---

[9] State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014).
[10] State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996).
[11] Gunderson, 181 Wn.2d at 922.
[12] ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in

"Improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole."[13] An evidentiary error that is not of constitutional magnitude, such as erroneous admission of ER 404(b) evidence, requires reversal only if there is a reasonable probability that the error materially affected the trial's outcome.[14] No such probability exits in this case. The overwhelming evidence of Yeck's guilt leads us to conclude that the outcome of his trial was not materially affected by the admission of a third conviction or the court's instruction about mistake or accident. .

To convict Yeck of the crime of violation of a court order, the trial court instructed the jury that it needed to find that a no-contact order existed, that Yeck knew of it, that Yeck "knowingly violated" it, and that he had "twice been previously convicted for violating the provisions of a court order."[15]

---

conformity therewith." However, such evidence may be admitted for another purpose, including, but not limited to, "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Evidence of the absence of mistake or accident "is never a material issue unless first raised by the defendant." State v. Ramirez, 46 Wn. App. 223, 228, 730 P.2d 98 (1986).

[13] State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001).

[14] State v. Stenson, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997).

[15] The court gave the same "to-convict" instructions on all counts. The only difference among these instructions is the date upon which Yeck allegedly contacted Remsberg, including count I (July 23, 2017), count II (between July 1 and July 29, 2017), and count III (July 29, 2017).

At trial, the State presented evidence of the March 2017 no-contact order and of Yeck's awareness of that order. Remsberg testified that she received a letter in Yeck's handwriting, asking that she contact him to confirm her desire to be a beneficiary on his half-million-dollar life insurance policy. She testified to receiving two messages—both mentioning Yeck's life insurance policy—sent from Yeck's Facebook account. The jury heard a recording of Yeck's jail call during which he stated, "I sent her that mail for the life insurance policy thing." Additionally, the evidence of Yeck's prior convictions was admitted to prove an essential element of the charged offense—that Yeck had twice before been convicted for violating the provisions of a court order.[16]

Given this evidence, the jury had more than sufficient evidence to decide that Yeck knowingly violated the March 2017 no-contact order. Thus, even if the trial court had not allowed the jury to consider the prior convictions for purpose of mistake or accident, the court's error did not materially affect the outcome of the trial.

## II. Motion for Mistrial

Yeck also contends that the trial court should have granted his motions for a mistrial. We disagree.

---

[16] "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case.'" State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting State v. Lough, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

A trial court should grant a mistrial based on an irregularity at trial only when the irregularity so prejudices the defendant that nothing short of a new trial can provide the defendant with a fair trial.[17] "In determining whether a trial court abused its discretion in denying a motion for a mistrial, we examine (1) the seriousness of the irregularity, (2) whether the statement was cumulative of other properly admitted evidence, and (3) whether the irregularity could be cured by an instruction."[18] Because the trial court is in the best position to determine if an irregularity at trial prejudiced the defendant, it has broad discretion to grant or deny a mistrial based on those irregularities.[19]

The irregularities here were not serious. Courts have found irregularities serious when the jury has heard inadmissible testimony that is inherently prejudicial.[20] Yeck contends that Remsberg violated motions in limine by "repeatedly referencing her troubled, abusive relationship with Yeck." Remsberg's testimony, however, was innocuous at best. She mentioned the phrase "we had a domestic situation," but the State immediately stopped and redirected her testimony. Another time, Remsberg said, Yeck "came to the RV and pounded on the door and shook the RV" but was not allowed to place that

---

[17] State v. Wade, 186 Wn. App. 749, 773, 346 P.3d 838 (2015) (quoting State v. Kwan Fai Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986)).

[18] Wade, 186 Wn. App. at 773.

[19] Wade, 186 Wn. App. at 773.

[20] See, e.g., State v. Escalona, 49 Wn. App. 251, 254-55, 742 P.2d 190 (1987); State v. Babcock, 145 Wn. App. 157, 163-64, 185 P.3d 1213 (2008).

statement in context. Last, when asked about receiving Facebook messages, Remsberg testified to opening "some of them." In context, it is unclear whether she was referring to opening some of her Facebook messages generally or opening those from Yeck specifically.

Moreover, Remsberg's testimony was cumulative of other evidence. The trial court aptly observed,

> Well, I think that the jury is aware that there has been some sort of domestic violence in the case because of the fact that there is a protection order. That she sought a protection order after the end of the relationship. And so I don't think that that comes as news to the jury that there has been at least allegations of domestic violence and a situation that the Court felt required a protection order be entered. And so I—it's not like none of that was known to the jury or has been put before the jury and now suddenly we're exploring other incidences.

We agree with the trial court's observations. Remsberg's inadmissible testimony, in essence, repeated what other evidence directly and indirectly showed.

Finally, the trial court's instruction to the jury cured the irregularity. After Remsberg testified about opening "some" Facebook messages and Yeck pounding on the RV door and shaking it, the court immediately instructed the jury to disregard counsel's question and Remsberg's answer. We presume that juries follow the court's instructions.[21] The instruction did not unduly emphasize the testimony, and the irregularity

---

[21] State v. Gamble, 168 Wn.2d 161, 178, 225 P.3d 973 (2010).

was not "'inherently prejudicial and of such a nature as to likely impress itself upon the minds of the jurors.'"[22]   Therefore, the trial court's instruction adequately cured the irregularity here.   The court properly denied Yeck's motion for a mistrial.

### III. Cumulative Error

Next, Yeck alleges that cumulative error deprived him of a fair trial. Because the only error in this case—the admission of one of Yeck's prior convictions for the purpose of showing the absence of mistake or accident—was harmless, we reject this claim.[23]

### IV. DNA Collection Fee

Lastly, Yeck seeks to strike the $100 DNA collection fee from his judgment and sentence.

Yeck contends, and the State concedes, that the DNA fee should be stricken pursuant to State v. Ramirez[24] because his DNA is already on file with the Washington State Patrol Crime Lab.   We accept the concession of error and

---

[22] Escalona, 49 Wn. App. at 255 (quoting State v. Miles, 73 Wn.2d 67, 71, 436 P.2d 198 (1968)).

[23] State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006) (explaining how the cumulative error doctrine "does not apply where the errors are few and have little or no effect on the outcome of the trial") (citing State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000)).

[24] 191 Wn.2d 732, 746-50, 426 P.3d 714 (2018).

remand to the trial court for a ministerial order striking the DNA fee from the judgment and sentence.[25]

## CONCLUSION

We remand for amendment of the judgment and sentence consistent with this opinion.  We otherwise affirm.

_Leach, J._

WE CONCUR:

_Mann, ACJ_

_Dwyer, J._

---

[25] See State v. Ramos, 171 Wn.2d 46, 48, 246 P.3d 811 (2011) (noting "when a hearing on remand involves only a ministerial correction and no exercise of discretion, the defendant has no constitutional right to be present").